02-10-045-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

NO. 02-10-00045-CV

 

 


 
 
 JPD Guam Company, Inc. and Johnny C. Reyes
 
 
  
 
 
 APPELLANTS
 
 
 
 
  
 V.
  
 
 
 
 
 DemetriUs A. Reyes
 
 
  
 
 
 APPELLEE
 
 


 

 

----------

 

FROM THE 78th
District Court OF Wichita COUNTY

----------

 

MEMORANDUM
OPINION[1]

----------

 

I. 
Introduction

          In
one issue, Appellants JPD Guam Company, Inc. and Johnny C. Reyes (collectively,
JPD Guam) appeal the trial court’s judgment for Appellee Demetrius A. Reyes on
JPD Guam’s breach of fiduciary duty claim.  We affirm.

II. 
Factual and Procedural Background

          The
sole issue before us is whether Demetrius, Johnny’s nephew, owed a fiduciary
duty to JPD Guam and Johnny, JPD Guam’s president, in the sale of three tracts
of real property.

          JPD
Guam and Johnny sued Demetrius for breach of fiduciary duty, fraud, fraud in
real estate transaction, fiduciary self-dealing, and unjust enrichment.  At
trial, Johnny argued that he had agreed to let Demetrius sell the three tracts
for 10% of the tracts’ sale prices as a finder’s fee, and Demetrius countered
that JPD Guam’s sales of the property to him were arm’s-length transactions.  There
were no written agreements between JPD Guam and Demetrius with regard to any
commission or finder’s fee.  The trial court ordered that JPD Guam take nothing
on any of its claims and made the following findings of fact pertinent to JPD
Guam’s sole issue on appeal:

1. Demetrius A. Reyes
was not an agent of JPD Guam Company, Inc. or of Johnny C. Reyes in regard to
any of the transactions at issue in this case.  Demetrius A. Reyes did not
agree to act as an agent for JPD Guam Company, Inc. in regard to any of the
transactions at issue.

 

2. A formal or
informal fiduciary relationship did not exist between Demetrius A. Reyes and
JPD Guam Company, Inc. or Johnny C. Reyes in regard to any of the transactions
at issue in this case.  Demetrius A. Reyes did not owe a fiduciary duty to
either JPD Guam Company, Inc. or Johnny C. Reyes.

 

The
trial court then concluded that Demetrius did not breach a fiduciary duty to either
JPD Guam or Johnny as to the transactions at issue.  This appeal followed.

III. 
Fiduciary Duty

          In
this factual sufficiency challenge, JPD Guam complains that the trial court
erred by determining that there was no fiduciary duty between the parties based
on agency, arguing that the record contains multiple instances of Demetrius
acting on behalf of and under the control of JPD Guam in the course of selling
the real property at issue.

A. 
Standard of Review

          Findings
of fact entered in a case tried to the court have the same force and dignity as
a jury=s
answers to jury questions.  Anderson v. City of Seven Points, 806 S.W.2d
791, 794 (Tex. 1991).  The trial court=s
findings of fact are reviewable for legal and factual sufficiency of the
evidence to support them by the same standards that are applied in reviewing
evidence supporting a jury=s answer.  Ortiz v.
Jones, 917 S.W.2d 770, 772 (Tex. 1996); Catalina v. Blasdel, 881
S.W.2d 295, 297 (Tex. 1994).

          When
reviewing an assertion that the evidence is factually insufficient to support a
finding, we set aside the finding only if, after considering and weighing all
of the evidence in the record pertinent to that finding, we determine that the
credible evidence supporting the finding is so weak, or so contrary to the
overwhelming weight of all the evidence, that the answer should be set aside
and a new trial ordered.  Pool v. Ford Motor Co., 715 S.W.2d 629, 635
(Tex. 1986) (op. on reh’g); Garza v. Alviar, 395 S.W.2d 821, 823 (Tex.
1965).  But when, as here, the party with the burden of proof appeals from a
failure to find, the party must show that the failure to find is against the
great weight and preponderance of the credible evidence.  Cropper v.
Caterpillar Tractor Co., 754 S.W.2d 646, 651 (Tex. 1988); see Gonzalez
v. McAllen Med. Ctr., Inc., 195 S.W.3d 680, 681–82 (Tex. 2006).  When
conducting a factual sufficiency review, a court of appeals must not merely
substitute its judgment for that of the trier of fact.  Golden Eagle
Archery, Inc. v. Jackson, 116 S.W.3d 757, 761 (Tex. 2003).  The trier of
fact is the sole judge of the credibility of witnesses and the weight to be
given to their testimony.  Id.

B. 
Agency

          To
prevail on a breach of fiduciary duty claim, a plaintiff must first prove the
existence of a fiduciary relationship between the plaintiff and the defendant. 
See Lundy v. Masson, 260 S.W.3d 482, 501 (Tex. App.—Houston [14th Dist.]
2008, pet. denied).  “[A] fiduciary duty arises out of agency law based upon a
special relationship between the two parties.”  In re Bass, 113 S.W.3d
735, 743 (Tex. 2003) (orig. proceeding) (citing Johnson v. Brewer &
Pritchard, P.C., 73 S.W.3d 193, 200 (Tex. 2002)); see also Shands v.
Tex. State Bank, 121 S.W.3d 75, 77 (Tex. App.—San Antonio 2003, pet.
denied) (stating that an agency relationship creates a fiduciary relationship
as a matter of law).  An agent is a person who is authorized to act for another
and is subject to the control of the other.  SITQ E.U., Inc. v. Reata
Rests., Inc., 111 S.W.3d 638, 652 (Tex. App.—Fort Worth 2003, pet. denied)
(noting that agency is generally a question of fact and that the trial court,
as factfinder, was free to resolve any inconsistencies in the conflicting
testimony to support its implied finding of agency).  “Texas law does not presume
agency, and the party who alleges it has the burden of proving it.”  IRA
Res. Inc. v. Griego, 221 S.W.3d 592, 597 (Tex. 2007); Tex. Cityview Care
Ctr., L.P. v. Fryer, 227 S.W.3d 345, 352 (Tex. App.—Fort Worth 2007, pet.
dism’d) (same).

C. 
Evidence

          The
three tracts of land at issue in this case are (1) a 6-acre tract sold by JPD
Guam to Demetrius, who then sold four of the acres to the Burkburnett
Independent School District (the BISD property); (2) an 11.6-acre tract sold by
JPD Guam to Demetrius, who then sold it to SKB Energy LLC (the SKB property);
and (3) a 17.522-acre tract sold by JPD Guam to Demetrius, who sold it to
Trinity Hughes LLC (the Trinity Hughes property).

          Demetrius,
age forty-five at trial, had taken some business and real estate classes at a
junior college but did not yet have a real estate license during the
transactions at issue.  His prior real estate experience involved a residential
home construction and remodeling business—PennRey Homes—that he started in the
mid-1990s.  Demetrius said that prior to the BISD transaction, neither he nor
any entity that he had worked for had ever sold or been involved in the
purchase or sale of land for commercial use.  Demetrius compared his knowledge
of commercial property to Johnny’s as “zero to one hundred,” and Johnny
acknowledged having considerably greater real estate experience than his
nephew.

          By
trial, Johnny, age sixty-nine, had spent eleven years in the military as a data
analyst and then spent the subsequent years building up his property
development business.  JPD Guam started operating in 1985; Johnny had been its president
since 1991 or 1992.

          Johnny
testified that JPD Guam, which has held assets of around $20 million, buys land
for development into commercial or residential property; that it develops land
for hotels, high-rise condominiums, and golf courses; and that it has done
business in Guam, Hawaii, and foreign countries.[2]
 Johnny’s old business card from around 1985, with his title “President,” was
admitted in evidence.  It lists, among eight others, the following companies: 
“Tonko Reyes, Inc.”; “JPD Guam Co., Inc.”; “RUCR Tex. Co., Inc.”; “RUMC, Inc.”;
and “UCRC, Inc.”  Johnny testified that Tonko Reyes, Inc. built retail shopping
complexes and that RUMC, Inc. and UCRC, Inc. were real estate businesses.

          Johnny
testified that prior to November 2002, he felt that he and Demetrius were
close, that he could trust Demetrius, and that he relied on Demetrius to be
truthful during their transactions.  Demetrius testified that he and Johnny did
not have a close relationship and that during the time period at issue here
(2000–2005), he “[f]elt it was more business than anything.”  Johnny’s wife
Kathrina was designated JPD Guam’s corporate representative during the trial.

1. 
Events Prior to and During 2000

          In
1991, RUCR Tex. Co., Inc., a corporation owned in part by Johnny and his
brother Joe—Demetrius’s father—acquired an 86.937-acre tract in Wichita County
that included the three tracts at issue here.  JPD Guam financed the construction
of utilities, streets, and other infrastructure on RUCR’s land, and from 1991
to 2002, RUCR tried to develop and market this property.

          Demetrius
wanted to acquire all of RUCR’s property.  In 2000, he bought 30.913 acres of
the property from RUCR for $170,000, after negotiating with Johnny and offering
what his father told him to offer.

2. 
Events in 2002

          In
March 2002, Demetrius and Johnny, acting for JPD Guam, entered into a contract
for sale of RUCR’s remaining property, including the three tracts at issue
here, for $175,000.[3]
 The contract’s closing date was August 1, 2002.  Demetrius testified that he
negotiated with Johnny through his father.

          In
April 2002, Demetrius had some of the property appraised to determine its
market value.  The appraiser concluded that the value of the 12.29-acre tract
adjacent to the John G. Tower Elementary School was $153,600, or approximately $12,500
per acre.  The same appraiser estimated the market value of an additional 29.6
acres—three tracts located near Interstate 44—was $444,000, or $15,000 per
acre; he billed Demetrius $985.  Demetrius never told Johnny or anyone from JPD
Guam about the appraisal, and Johnny was unaware of the appraisal during the
sale of all three tracts at issue here.  However, Johnny acknowledged that he
knew how to obtain property appraisals and that he had done so over the years
for other property.

          In
June 2002, JPD Guam foreclosed on RUCR’s note and obtained RUCR’s remaining
34.195 acres via trustee deed.[4] 
Billy Elder, a Wichita County attorney, was RUCR’s bankruptcy trustee.  On June
14, 2002, Elder sent Johnny a letter setting out the following:

Pursuant to your
instructions I have foreclosed on the property owned by RUCR Tex Co., Inc., in
favor of JPD Guam Company, Inc. (“JPD”).  Enclosed you will find a copy of that
Foreclosure Sale Deed.  Therefore, for you to sell this property to Dee, the
Contract must be signed by JPD rather than RUCR Tex Co., Inc.  For that
reason I am enclosing three (3) copies of an Unimproved Property Contract which
must be initialed by you on each page and signed on the last page by you as
President of JPD.  Please sign these Contracts and return them to our office as
soon as possible so that Dee can get his loan approved and we can set up the
closing.  [Emphasis added.]

 

Johnny
was Elder’s client at the time.  Demetrius and JPD Guam entered a new contract
with the same price ($175,000) and terms as the original contract and with the
same August 1, 2002 closing date.  The contracted-for property had the same
legal description as the 34.195-acre property foreclosed upon by JPD Guam.

          Johnny
testified that there were no negotiations between him and Demetrius involving
RUCR’s land and that he was not involved in the earnest money contracts for it,
but he also stated:

Billy [Elder] always
told me that Dee is trying to buy the property.  I said okay.  Now, yes, I
signed this [Defendant’s Exhibit 4, the earnest money contract] because Billy
wants me to sign the documents because Dee wants to take it to the finance to—company
to get his money to buy it.

 

Johnny
acknowledged that his signature was on Defendant’s Exhibit 4 and that, by
signing the earnest money contract, JPD Guam was agreeing to sell all of the land
to Demetrius for $175,000.

          On
June 26, 2002, Johnny sent a letter to Elder stating that the “enclosed
documents have been signed and forwarded for you and Dee” and that Johnny would
be forwarding the directors’ resolution on the sale per Elder’s request. Johnny
said that he did not present the earnest money contract to JPD Guam’s directors
to approve its terms; however, on July 1, 2002, Johnny sent Elder a fax
entitled “Resolution,” with an attachment stating,

RESOLUTION OF BOARD
OF DIRECTORS OF

JPD GUAM CO., INC.

 

          RESOLVED, that Johnny C.
Reyes, the President of JPD Guam Co., Inc., authorized in the name of and for
the account of this Corporation and such terms and conditions as he may deem
proper for the sale of a tract of UNIMPROVED PROPERTY, out of A.R. Collins
Survey, Abstract No. 414, Wichita County, Texas.[[5]]  To do and perform all acts
and sign all agreements, obligations, pledges, and/or other instruments
necessary or required by all agreement transactions for its protection in its
dealing with this Corporation.

 

          RESOLVED,
FURTHER,
that any interested buyer be furnished with a copy of these resolutions, and it
be authorized to deal with the officer herein above named under said authority
until expressly notified in writing to the contrary.

The
resolution is signed by Lawrence J. Teker, Secretary, on June 25, 2002. Johnny
testified that Teker was an attorney.

          Demetrius
testified that after entering the earnest money contract, he tried to find
buyers for the property by contacting all of the realtors he knew to tell them
about the property.  Paul Harris became Demetrius’s realtor for the BISD
property.  Demetrius asked Harris to contact Danny Taylor, BISD’s
superintendant, about the property adjacent to the elementary school.

          On
July 27, 2002, Harris sent a letter to Taylor that stated that he represented
PennRey Homes, “who currently owns the 12.29-acre tract of land directly south
of John Tower Elementary and adjacent to Hooper Road,” and that PennRey Homes
proposed to sell the land to the school district for $175,000, or divided for
$17,500 an acre, with a 6-acre minimum.  Below Harris’s signature, Demetrius
signed the letter for PennRey Homes.  Demetrius testified that Harris sent the
letter to Taylor on Demetrius’s behalf, even though PennRey Homes did not yet
own the 12.29-acre tract at the time.[6]

          Demetrius’s
earnest money contract with JPD Guam expired on August 1, 2002, when he could
not find the money to complete the transaction.  However, on August 9, 2002,
Harris sent another letter to Taylor, stating that “Mr. Reyes” proposed to sell
approximately 4 acres to the school district at $17,500 per acre, for a total
price of $70,000.  A handwritten note on Harris’s letter indicates that the
school district’s board of trustees approved the purchase on September 19,
2002.

          Dennis
Probst, an engineer and surveyor, testified that Elder called him on September
30, 2002, and ordered a survey of the 6-acre tract that included the BISD
property.  Probst met with Harris and Demetrius to establish the property’s
exact dimensions, and they tried to configure the property “in the best way to
not impact the rest of the property unfavorably.”

          JPD
Guam offered, and the trial court admitted, the September 30, 2002 minutes from
JPD Guam’s shareholders’ annual meeting.  The “Shareholders Present” section
reflects that Johnny, as president, and Kathrina, as secretary, were present,
as well as Daniel Reyes by proxy.[7] 
The minutes, which Johnny testified were prepared on September 30, 2002, state
that

[t]he President
informed the stockholders that the Corporation’s R-2 lot consisting of 12 acres
in Wichita Falls, Texas, of which 6 acres is under consideration for sale to
John Towers School for $50,000 as suggested by Dee Reyes reflecting the current
fair market value.  Johnny Reyes made an agreement with Dee Reyes, nephew, to
sell the property and offered him a finder’s fee of up to 10% of the value
since he is not a licensed real estate agent.  Although Dee Reyes is not a
licensed real estate agent, he has a builder’s business license under Penn[R]ey
dealing with buying and selling houses and property.  He builds new houses and
refurbishes dilapidated houses for resale. The target date will take place
sometime in November or by the end of the calendar year.

          In
November 2002, Elder sent Johnny a letter enclosing a warranty deed for two
tracts of land from JPD Guam to Demetrius Reyes d/b/a PennRey Homes.  The
letter states, “It is our understanding that you will execute this Deed and any
consideration to be paid you for such will be handled outside of our office
after Demetrius Reyes sells the properties.”  Handwritten, below the signature
line, Elder wrote, “Dee said he has talk [sic] to you about this.”

          On
November 25, 2002, Johnny, on behalf of JPD Guam, executed a deed for two
tracts of land—a 4-acre tract and a 2.02-acre tract—to Demetrius and PennRey
Homes.  Demetrius testified that he paid JPD Guam $55,000 for the property.  Elder
said that there was no formal closing from JPD Guam to Demetrius on this
property and that that there was no settlement statement for the sale from JPD
Guam to Demetrius because it was “one of those situations where Dee came in and
said, [‘]Johnny will come in and sign it, just do a deed.[’]” Elder stated that
he did not know what took place outside of his office, other than that the deed
was sent to Guam for Johnny to sign and that it was signed by Johnny.

          On
December 4, 2002, BISD closed with Demetrius on the 4-acre tract for $70,000.  On
December 5, 2002, Demetrius received $63,421.12 from BISD and then sent a wire transfer
of $55,000 to Johnny.  Demetrius received confirmation from the bank that day
that the $55,000 had been credited to Johnny’s bank account in the “branch in
[T]amuning[,] [G]uam,” and the bank’s confirmation was entered in evidence.

          Demetrius
testified that JPD Guam and Johnny did not complain about the $55,000 purchase
until Johnny filed the lawsuit.[8]
 Johnny testified that, to his knowledge, he had never received the $55,000
wire transfer, and Kathrina testified that she could not confirm receipt of
that money and denied that they had received it.  However, Johnny made the
following allegation in paragraph 8 of his original petition:

In November 2002, the
Defendant telephoned Mr. Reyes at his place of business in Guam and informed
Mr. Reyes that Defendant had secured a Buyer for the Plaintiff’s property for
a sale price of $50,000.00.  Defendant informed Mr. Reyes that Plaintiff
would need to sign a Deed conveying title to the property to Defendant in order
to facilitate the sale.  Defendant forwarded to Mr. Reyes in Guam closing
documents for Mr. Reyes to sign.  Mr. Reyes signed the closing documents on
Plaintiff’s behalf, selling the property for $50,000.00.  Afterward, Plaintiff
received the $50,000.00 sale proceeds.  Mr. Reyes requested copies of the
closing documents, but has never received them.  On information and belief,
Plaintiff represents to the Court that the Defendant intentionally
misrepresented the terms of the sale to Mr. Reyes[] and conveyed only 4 acres
of the property to a third party Buyer in this transaction. [Emphases added.]

During
cross-examination, Johnny said that the statement in his pleading about
receiving the sales proceeds was probably incorrect; on redirect, he stated
that he had not been able to verify the deposit yet but acknowledged that he probably
did receive payment.  Kathrina testified that the pleading was based on a
chronology that she had prepared for their first attorney in this case.

          Johnny
testified that he was in Guam when Demetrius called him and asked him if he
could sell JPD Guam’s property for Johnny.  Johnny said that he asked Demetrius
if he had a real estate license, that Demetrius said no, and that he offered to
pay Demetrius 10% as a finder’s fee.  Johnny admitted that there is no written
agreement to document this arrangement.  Johnny acknowledged that he could have
had Teker, JPD Guam’s corporate secretary, draw up an agreement for the parties
at any time.

          Johnny
stated that, with regard to the BISD property, Demetrius called him around the
end of July or the beginning of August, told him that he had found a buyer and
that he was negotiating, and told him that the property’s market value was
$50,000.  Demetrius never showed Johnny the property appraisal or told him that
he was selling the land for $70,000.  Demetrius told Johnny that he would send
him the warranty deed to sign when Demetrius was ready to sell, that Johnny
should sign it but not date it, and that Demetrius would fill in the date at
closing.

          Demetrius
testified that he called Johnny about the BISD property, but he denied that he
asked Johnny for permission to sell the property on JPD Guam’s behalf or that
he acted in any capacity as Johnny’s or JPD Guam’s agent, and he testified that
he did not sell the BISD property on JPD Guam’s behalf.  Demetrius said that he
probably did not tell Johnny or anyone from JPD Guam that he had sold the BISD
property for $70,000 and that he did not tell Johnny or anyone at JPD Guam that
he intended to combine the 2.02-acre tract with his other property to add an
entire row of lots, which he later sold to the Wichita County Board of Commerce
and Industry (BCI) for $205,000.  After the BISD sale, Demetrius continued to
try to work deals involving the remaining land owned by JPD Guam, stating, “I’d
go out and make sure all the realtors knew that property was available.  And
when somebody expressed interest, I’d call my uncle and we’d go back and forth
on negotiating a price.”

3. 
Events in 2003

          In
November 2003, Demetrius and SKB Energy LLC, a company represented by Trinity
Hughes’s chief executive officer Dave Lilley, agreed to the sale of 11.6
acres—described as Lot 16, Block 4, Guam Estates—from Demetrius to SKB for
$120,000, to close on December 15, 2003.

          Demetrius
testified that he contracted with JPD Guam for the SKB property in late 2003 by
calling Johnny.  Demetrius described their conversation as, “Generally it would
be I’d call him up, ask him how much he wanted for it, he’d give me a price,
I’d counter offer, he’d counter offer, and we’d go back and forth until we both
agreed on a price.”  Demetrius stated that this was the same sort of
negotiation that went on with regard to the BISD and Trinity Hughes properties
and that there was never any discussion between him and Johnny about working
for JPD Guam on commission.

          Demetrius
agreed to pay JPD Guam $75,000 for the SKB property—$50,000 in cash and $25,000
in a promissory note that could be forgiven.  On December 5, 2003, Elder’s
office sent Johnny a letter referencing the SKB property and stating that an
original settlement statement, warranty, and promissory note were enclosed;
Anne Thompson, Elder’s legal assistant, signed the letter.[9]  Johnny acknowledged that he
signed the settlement statement on the property, which reflects a sale price of
$75,000, including a $25,000 loan from seller to buyer.

          Demetrius
stated that he never told Johnny or anyone from JPD Guam that he had a sale
lined up for $120,000.  JPD Guam and Johnny did not complain about the sale
until 2005, when Johnny filed the lawsuit.  Demetrius stated that they never
demanded payment on the $25,000 note until filing the lawsuit.

          Johnny
testified that, as before, Demetrius called to tell him that he was negotiating
a deal on the property, “and, you know, he’s—he’s gonna be buying it for
[$]120,000.”  According to Johnny, he agreed to $120,000, and then Demetrius
called him back and said that the buyer only wanted to pay $75,000. Johnny
stated that the arrangement between JPD Guam and Demetrius was the same as
before:  JPD Guam would pay Demetrius 10% to sell the property.  But Johnny
again acknowledged that they had no writing to memorialize this agreement.  As
before, Johnny did not know the property’s appraisal value.

          Johnny
gave contradictory testimony about when he found out Demetrius was selling the
property for $120,000:

Q.  . . . At any
point in time did he tell you that he was gonna get—that he had entered into an
agreement to sell it for [$120,000]?

 

A.  Yes, in the
beginning, you know.

 

Q.  Before the sale
consummated, did he ever tell you that he was actually gonna get that much?

          

A.  No.

 

          James
Norseworthy, a realtor and real estate broker, testified that he had been
involved in the sale of the SKB property and that Demetrius had approached him
and some other realtors when Demetrius began subdividing land into three
parcels.  Norseworthy became the realtor for the SKB property; two other
realtors received the other tracts, and they listed all of the tracts around
the same time.

          Norseworthy
initially testified that he “believe[d] [Demetrius] was representing his
uncle,” before he added, “I’m not for sure, but I think that’s the way it
was.”  He then replied, when asked whether Demetrius indicated to him that
Demetrius was representing his uncle, “Yes, that’s correct.”  But Norseworthy
also stated that he thought Demetrius represented Johnny when RUCR, not JPD
Guam, owned the property.  After JPD Guam acquired RUCR’s land, Demetrius never
called Norseworthy to tell him that he was not representing Johnny.

          On
December 15, 2003, Johnny, on behalf of JPD Guam, executed a deed for 11.66
acres to Demetrius.  The settlement statement of the JPD Guam-Demetrius sale
shows that Johnny sold the SKB property to Demetrius for $75,000, with a
$25,000 loan from seller to buyer.  On December 15, 2003, Demetrius made a
promissory note payable to Johnny for $25,000.  The note contains the following
language:

NOTWITHSTANDING
ANYTHING CONTAINED HEREIN TO THE CONTRARY, IT IS AGREED AND UNDERSTOOD THAT IF
ALL OR PART OF LOT NO. TWENTY (20), BLOCK FIVE (5) AND LOT TWENTY-ONE (21),
BLOCK NINE (9) OF THE REVISED PRELIMINARY PLAT OF GUAM ESTATES DATED JULY 11,
1994, AS MORE FULLY DESCRIBED ON THE EXHIBIT “A”, ARE SOLD FOR $200,000.00 OR
MORE, THIS PROMISSORY NOTE SHALL BE NULL AND VOID.  IN ADDITION TO THE
FOREGOING, IF SUCH LOTS ARE SOLD FOR MORE THAN $200,000.00[,] MAKER SHALL BE
ENTITLED TO RETAIN ALL NET PROCEEDS IN EXCESS OF $200,000.00.

Demetrius
testified that the two lots referred to in the promissory note comprised the
Trinity Hughes property and that he and Johnny included this provision as part
of their negotiation process.  Elder testified that he drafted the $25,000
promissory note from Demetrius to Johnny, that the paragraph in bold,
capitalized letters was something that Demetrius and Johnny had agreed upon,
and that he was instructed to put the paragraph in the note.  Elder stated that
he was not acting as attorney for either side when he drafted the note but
rather just as a closing agent for that transaction.

          At
trial, Johnny claimed that the promissory note was due.[10]  Johnny also testified that
he was not familiar with the note’s bolded, all-caps paragraph and that, prior
to signing the note, he was never told about the property’s April 2002
appraisal.  Johnny also stated that although he signed and approved the note,
he did not remember reading it.  With regard to documents that he signs, Johnny
stated, “They just put it in front of me and I trust my people that are doing
it so I just sign it.”  He clarified that “they” meant his employees.

4. 
Events in 2004

          At
Elder’s office on October 20, 2004, JPD Guam sold some property to BCI,
Demetrius sold his RUCR property to BCI, and Demetrius purchased the Trinity
Hughes property from JPD Guam.

a.   
 BCI Property Transactions

          Demetrius
testified that he was contacted about the property BCI wanted to purchase and
that he contacted Johnny and told him what BCI wanted to buy. He stated that he
did not try to acquire JPD Guam’s land to sell to BCI, that JPD Guam sold its
land to BCI directly, and that Johnny was fully involved in the process.

          Tim
Chase, the president of the Wichita Falls Chamber of Commerce and Industry
(formerly BCI), testified that he had no dealings with either Johnny or
Demetrius other than the purchases of their tracts of land.  Chase was unsure
exactly with whom he had dealt, stating, “You know, I’m not even sure if it was
Johnny or who, it was just the Reyes family was involved with the sale of the
land.  I’d have to look back through the records to see the name specifically
of the people involved.”

          On
March 24, 2004, Johnny, on behalf of JPD Guam, executed an earnest money
contract with BCI for 8 acres for $115,000.  Paragraph 24 of the earnest money
contract, entitled “Adjacent Property,” contains the following:

Concurrently with the
submission of this Contract by Seller to Buyer, Buyer has submitted an
earnest money contract to Demetrius A. Reyes and Darlene P. Reyes, (the
“Adjacent Owner”) relating to the purchase of 36 acres, more or less, located
adjacent to the Property (the “Adjacent Property”).  Buyer’s purchase of
the Adjacent Property is essential to the Buyer’s proposed use of the Property,
and Buyer does not intend to purchase the Property unless Buyer is able to
purchase the Adjacent Property at or near the same time. [Emphasis added.]

          On
May 27, 2004, BCI sent Demetrius a letter referencing their March 15, 2004
earnest money contract and stating that an environmental site assessment raised
some concerns and that it would exercise its right to terminate the contract
subject to remediation.  On the same day, BCI sent JPD Guam a letter
referencing their March 24, 2004 earnest money contract, which included the
same environmental site assessment and remediation language.

          Kathrina
testified that in June 2004, she and Johnny asked Demetrius what was happening
with the sale to BCI and that he told them that it was on hold pending an
environmental study.  Kathrina said that Demetrius asked them “to go in half
and half on the expenses” for the environmental cleanup.  Kathrina said that
they also asked Demetrius about the acreage involved, because the contract they
received listed 8 acres, and they thought they only had 6 acres to sell.
Kathrina said that Demetrius avoided answering that question.

Demetrius
testified that because of BCI’s environmental concerns, he had to clean up the
property, including having the property surveyed.[11]  BCI reinstated both
Demetrius’s and JPD Guam’s contracts in July 2004, and both contracts closed on
October 20, 2004.

b.  
 Trinity Hughes Transactions

          In
mid-to-late summer 2004, Lilley (Trinity Hughes’s CEO) and Demetrius negotiated
over the Trinity Hughes property.  Lilley testified that Demetrius never
provided him with proof that he owned the property or talked with him about who
owned it.  On May 5, 2004, Demetrius (d/b/a Short Skirts Management and
Holdings, L.L.C. (Short Skirts)) agreed to sell 18.2 acres “more or less” to
Trinity Hughes for $588,000, with a closing date of July 23, 2004.[12]

          Demetrius
testified that he called Johnny, told him that he had a possible buyer for the
property, and discussed a $200,000 price with him but that Johnny wanted more.  They
negotiated back and forth until they could agree on a cash purchase of $207,000
between Demetrius and Johnny.  On May 14, 2004, Johnny, on behalf of JPD Guam,
signed a contract with Demetrius for $207,575 for the Trinity Hughes property,
to close July 23, 2004.  Demetrius said that he had expected his closing with
JPD Guam and his closing with Trinity Hughes to both occur in August but that
Trinity Hughes had problems with its financial backers and postponed closing.

          Johnny
testified that, as before, Demetrius called him and told him that he was
negotiating a deal to sell the property, this time, to a California company,
and that Johnny agreed to the same 10% finder’s fee.  Johnny said that
Demetrius told him that the property’s market value was $200,000 to $250,000.
When Johnny and his family lived with Demetrius during June 2004, Demetrius
never mentioned the April 2002 appraisal or his agreement with Trinity Hughes to
sell the property for $588,000.

          Demetrius’s
notes were admitted in evidence; the notes are undated, and Demetrius indicated
that some of the writing is not his.  The notes have two prices lined out,
“Sale Price $238,500,” and “Contract Price $213,500,” before $207,575 is left
unlined on the same line as “Contract Price.”  The following figures listed on
the page reveal how the $207,575 was calculated: 




 
 
 238,500
 -11,925 
 COMM
 -25,000 
 DEE
 +6,000
 EARNEST/OPTION
 
 
 
 
 207,575
 -? 
 CLOSING COST
 
 




 

$11,925
is 5% of $238,500; Demetrius testified that the $11,925 might be the realtor
commission and that the $25,000 is “the promissory note.”

          On
June 28, 2004, Elder’s office sent to the title company a letter that attached
copies of the settlement statement, an affidavit to debts and liens, and the
warranty deed for the Trinity Hughes property and included the following
statement:

It is my
understanding that Demetrius Reyes is selling this property on July 23, 2004
and this closing is supposed to happen at the same time.  Demetrius Reyes has
asked that Guarantee Title cut a check to Fudge and Elder for $206,776.93 and
we will disburse the funds as described on the Settlement Statement enclosed. 
We will forward a filestamped photocopy of the Warranty Deed once it has been
recorded.

The
attachments were not included in the exhibit admitted at trial.  Thompson
signed the letter.  However, Demetrius and JPD Guam amended their sales
contract on July 22, 2004, to reflect a higher price of $211,575, with a new
closing date of September 23, 2004.

          The
warranty deed from JPD Guam to Demetrius was filed on July 29, 2004.[13]  An additional
warranty deed, from Demetrius’s transfer of the Trinity Hughes property to
Short Skirts, was filed on the same day.  Elder testified that Thompson handled
the closing and filed the documents at Demetrius’s instruction.  Thompson
testified that Demetrius instructed her to prepare the deeds—which she did—and
that Demetrius told her to file them, which she filed simultaneously.  Thompson
brought the situation to Elder’s attention after Demetrius’s check for the
filing fees bounced, and at some later point, Elder told her not to prepare any
more deeds without his review.  Thompson testified that she never received any
instructions from Johnny.

          Demetrius
testified that although the settlement statement between JPD Guam and Demetrius
shows that they closed on July 23, 2004, they actually closed on October 20,
2004.  Elder stated that Demetrius could not buy the property on July 23
because he did not have the money for it.

          The
September 21, 2004 minutes from JPD Guam’s shareholders’ annual meeting, which
were admitted in evidence, state, 

The President
informed the stockholders that he entered into a verbal agreement with Dee
Reyes, nephew, to sell the Corporation’s commercial lot of approximately 17
acres to Trinity Hughes for $211,575.  Dee Reyes suggested the fair market
value is between $200,000 and $250,000.  The tax roll showed an assessment
value of $101,430.  Closing on July 23rd did not materialized [sic]
but was extended to September 23, 2004.

Johnny
said that the sale from JPD Guam to BCI was not included in the minutes because
he did not know at the time if the sale would go through.  He attempted to
explain why Trinity Hughes was mentioned in the minutes, stating that although
he did not know that it would be sold to Trinity Hughes,

This is—when—when
this started out, when they were gonna close, I don’t know who it is.  And when
it is Trinity Hughes, we—we—we have our meeting in September and say, you know,
that probably it’s Trinity Hughes because Dave Lill[e]y was Trinity Hughes. 
But we’re not sure so I’m putting in Trinity Hughes so that—to tell us that
that’s the name of the company.  We don’t know who it’s gonna be.

Johnny
acknowledged that JPD Guam’s sale to BCI and the third sale were in the same
status at the time, i.e., waiting to see if everything could be done to close
them.

          In
a letter dated September 20, 2004, Elder informed Lilley that his firm had been
retained to represent Demetrius with regard to the earnest money contract, that
Demetrius expected Trinity Hughes to close on the eighteen acres under
contract, and that failure or refusal to close would “cause [Demetrius] to lose
the property and any profit that he would have made on the sale” because
Demetrius’s “interest in the property will be forfeited by him if this closing
does not occur by September 23, 2004.”  In a letter dated September 22, 2004,
Lilley stated that Trinity Hughes still wanted to come to terms on the eighteen
acres under contract but had not received a response about its desire to
renegotiate some terms of the original contract.  JPD Guam and Demetrius did
not amend their contract again when the September 23 closing date passed.

c.   
 October 2004 Closings

          On
October 20, 2004, Demetrius sold a 31.779-acre tract to BCI for $205,000, and
JPD Guam sold to BCI a 6.541-acre tract for $115,000.[14]  The closings took place at
Elder’s office.

Kathrina
testified that she was at the BCI closings and described the following:

          When we
first arrived there, they were working on closing the BCI deal with Demetrius
Reyes.  So we just sat there at the table and we just waited until they did
their closing with Demetrius Reyes.  And then after the closing, they turned it
over to us.  And my husband just signed whatever papers they wanted him to sign
for the closing with BCI.

 

          Then
Demetrius—we stood up, and Dave Lill[e]y and another one of his associates—I
don’t really know who he is, but other two people with him, they got up and
they walked over to a separate room.  We were in the main area of Billy’s—I
don’t know what they call it—common area—and they were walking into a separate
room, and Dee stood up and said to us, I will handle everything from here. Just
wait for me out here.

 

          So I looked
at my husband and I said, you know, aren’t we going to go in there?  And he
just looked at me and said that’s okay. . . . So we sat back down and we
waited, and then in about five minutes he came out and he handed us a check—two
checks, in fact.  One was for the BCI, and the other one was for the down
payment.  And then he walked us out the building, and, you know, he even walked
us out to our car.  And, you know, and he says, you know, I’ll take care of
it.  And that was it. 

 

          Demetrius
testified that he salvaged the sale to Trinity Hughes by financing it himself,
that Johnny financed the sale of the land to him, and that Demetrius’s
out-of-pocket costs were almost $50,000.[15]
 Johnny demanded 20% down and 8.5% interest to finance the sale to Demetrius,
so for Demetrius to close the Trinity Hughes deal, he had to first obtain cash
from his BCI sale.  On October 20, 2004, a check made payable to “JPD Guam
Company, Inc. and/or Johnny C. Reyes” was written on Fudge & Elder’s escrow
account for $41,066.93, “for proceeds from 7/23/04 closing”—referencing the
original closing date of the JPD Guam-Demetrius sale.  Elder testified that
this check was the proceeds from the sale of the Trinity Hughes property from
JPD Guam to Demetrius.

          A
collateral transfer of note and lien dated October 20, 2004, shows that
Demetrius was indebted to JPD Guam for $191,575, that a $580,000 note executed
by Trinity Hughes was collateral for Demetrius’s debt, and that the debt was on
17.522 acres.  The collateral transfer of note and lien document was
subsequently amended to change the debt amount from $191,575 to $169,260, and
to reflect that the debtor was Short Skirts, not Demetrius.  Demetrius
testified that he never sent either the original collateral transfer of note
and lien or the corrected one to any representative of JPD Guam and that he did
not know if Johnny or anyone at JPD Guam received them.  However, he also
testified that he expected the collateral transfer of note to be presented to
JPD Guam and that he never conspired with Elder to hide it or anything else
from Johnny or JPD Guam.

          Elder
described his conversations with Demetrius and Johnny about the Trinity Hughes
property as follows:

Well, as I understand
it, Dee was saying that he made a deal to buy the properties at [$]211,575 and
that deal was made back in June.  Dee was not able to come up with the cash to
close it.  And part of the reason was because what he had sold it for, they
were supposed to pay cash, couldn’t come up with the money. . . .  And I had
several conversations with Dee about, well, do I still sell it to these guys
because it’s too good of a deal not to sell it to them.  And my response to him
was owner finance it.  That way you’ve at least got the property.  If they
don’t pay you, you get the property back.  But that’s a good price to sell it
for.

 

          But Dee was
taking the position from back in June that he’d made the deal with JPD for
$211,000.  Well, he didn’t get the money to pay the $41,000 on the property
until he closed on the transaction and JPD closed on the transaction with BCI
which, if you’ll notice, took place on or about that same day in October.

 

          And so
there was—there was a lot of haranguing and going back and forth that Dee and
Johnny had between June and October because Dee couldn’t come up with the money
and he was supposed to.  And so how many times the deal changed, I can tell you
it changed all the way up until the day—October 20th, the day they signed
this.  We made changes to the papers and that’s why some of these had to be corrected
is because it was such a rush job that they wanted changes made that day on
October 20th.  So the deal was changing all the way up till October 20th.

 

          Now,
did—did Johnny know what Dee had sold it for to Trinity Hughes?  I have no idea
if he knew back in June or July when Dee made the deal with him to sell it to
him for 211.  But on October 20th, that day he knew . . . because he got a
Collateral Transfer of the note and Deed of Trust as collateral. . . .  I
discussed it with him in detail and distinguished the difference with—the
difference between a Deed of Trust and a Collateral Transfer of Note and Lien
because Johnny kept saying, well, I’m going to have a lien on this property. 
And my response to him and continued to be at closing, Johnny, you’re gonna
have a lien on the note, not the property.  But if they don’t pay the note,
then you will have in a round about way a lien on the property.  And we
discussed that in detail . . . on the 20th.

 

          Johnny
testified that he never received a copy of either the collateral transfer of
note or corrected collateral transfer of note and that neither he nor Kathrina
was ever told of the $588,000 sale to Trinity Hughes.  Johnny denied that Elder
ever went over the collateral transfer of note with him and stated that he
never saw it before 2005.  Kathrina stated that the closing took no more than
thirty minutes, that there was no closing for JPD Guam with regard to 18 acres
on October 20, 2004—the approximate amount of property in the Trinity Hughes
sale—and that Elder never discussed the collateral transfer of note with them.

          Elder
testified that the closing between Demetrius and Trinity Hughes did not occur
until October 21, 2004, and the deed of trust between Demetrius (as Short
Skirts) and Trinity Hughes shows that it was not signed until that day.  Trinity
Hughes’s $580,000 note is dated October 20, 2004, but it does not indicate when
it was signed.  Elder testified that the deed of trust and note would have been
signed at the closing on October 21, 2004.  Johnny testified that he was not in
the same room when the Trinity Hughes documents were being signed.

5. 
Events of 2005

          Johnny
had knee surgery in November 2004; Kathrina was in charge of JPD Guam while he
was recuperating.  Demetrius testified that about six months after the Trinity
Hughes property closed, Kathrina called him, wanting to renegotiate.  Johnny
testified that around February or March 2005, he mentioned to Kathrina that
they had not received any money or documents, and she called Elder to find out
what was going on.  Kathrina said that Elder gave them the documents in March
and that Elder’s office staff claimed that they had not known where to send the
documents, even though Johnny had left a forwarding address in Guam.[16]

          Kathrina
testified that she and Johnny called Elder because they wanted to know “what
was going on with the properties,” and when they arrived at Elder’s office, she
asked him for the closing documents for the sale of JPD properties. Kathrina
stated that the first time she learned of the $580,000 sale was when she asked
Elder about the closing documents.  However, on cross-examination, Kathrina
admitted that, in the chronology that she had prepared in October 2005 and
produced during the course of the litigation, she noted that Johnny learned of
the $580,000 sales price on October 20, 2004. 

          Elder
testified that in 2005, he became aware of the controversy with regard to the
Trinity Hughes property in connection with an income tax question by Johnny and
Kathrina.  He stated that Johnny and Kathrina’s copies of the documents, “a set
of documents which included all the Collateral Transfers and everything,” were
sent to Guam and that Johnny and Kathrina did not make any complaints to him
about the transactions involving the BISD or SKB properties.

          On
May 6, 2005, Kathrina, on Johnny’s and JPD Guam’s behalf, sent a letter to
Trinity Hughes, LLC, informing Trinity Hughes that JPD Guam was invoking
section D.2.a. of the October 20, 2004 collateral transfer of note and lien and
wanted all payments sent directly to Johnny, with all checks made payable to
“JPD Guam, Inc. and/or Johnny C. Reyes.”  However, as of May 6, 2005, Demetrius
was not in default to JPD Guam.  Lilley testified that prior to receiving JPD
Guam’s demand letter, he was unaware of JPD Guam’s claim to the sale proceeds.[17]

          The
trial court admitted in evidence Elder’s July 26, 2005 letter to Johnny,
Kathrina, and Demetrius, in which Elder informed them that his firm could no
longer represent JPD Guam or Demetrius due to their conflict; that, until March
8, 2005, when Kathrina and Johnny came to his office, he was unaware of any
conflict; and that, in May 2005, it became clear that no agreement or
compromise in settling the dispute was possible.  Elder then set out his understanding
of the events precipitating the dispute:

          It is my
understanding that Dee takes the position that he negotiated a sales price on
the purchase of the 11.752 acre tract and the 5.77 acre tract from JPD for the
cash purchase price of $211,575.00.  This was negotiated in April or May of
2004.  We were instructed by Dee to prepare a cash deed which was given to
Johnny, who signed it and returned it for filing.  Title was then transferred
from Dee to his company, Short Skirts Management and Holdings, LLC.  At no time
were we ever instructed to hold either Deed in escrow. 

 

When Dee discovered
that Trinity Hughes could not obtain the necessary financing and its financial
backer withdrew, it was necessary for Dee to renegotiate his agreement with JPD
because he would not have the cash to purchase the property outright.  I do not
know what conversations took place during this renegotiation period, but I do
know from conversations with Johnny that if Dee paid at least 20% down, JPD
would finance the balance.  The closing statement shows July 23, 2004, for the
effective date of sale, but it was not finally consummated until October when
Dee actually had the money to pay the 20% down and had closed on Short Skirts’
sale of the property to Trinity Hughes.

 

Since the property
had already been placed into the name of Dee and then from him into Short
Skirts by cash deeds, filed in July of 2004, it was necessary to secure JPD’s
note with the Trinity Hughes Note and Deed of Trust.  All of which was done as
evidenced by the endorsement of the Note and the Collateral Transfer of the
Trinity Hughes Note and Deed of Trust.  If Dee were trying to hide the value of
the Trinity Hughes sale, it certainly was not reasonable for him to pledge such
note as collateral.

 

It is my understanding
that JPD has taken the position that Dee was their agent and as such should
have obtained the best price possible.  JPD claims that Dee is the one [who]
set the value of the property at $211,000.00, and thus the reason the property
was sold to him for that price.  When the principals in Guam discovered from
the Collateral Transfer that Dee had resold the same property for $580,000.00,
they became disgruntled because he was only given the authority to make a
$100,000.00 profit rather than $368,425.00 profit.  I do not know what
knowledge Johnny had as to the amount of profit being made by Dee, but I do
know that he was present at the signing of the HUD-1 in October of 2004. 
[Emphasis added.]

          Elder
testified that “the $100,000 that Johnny had said was okay for Dee to make on
the deal was considerably more than what a normal realtor would make,” and he
stated that in one of the earlier transactions, he made a comment to Johnny
that Demetrius was “flipping” the properties.[18]
 Elder testified, 

And I had a personal
conversation with Johnny to let him know that he was flipping these because I
wasn’t going to be a party to simultaneous closing where two clients are
sitting there and one is making a huge profit while the other one doesn’t know
about it.

 

And Johnny’s response
to me was, well, he’s making a little bit more profit, I’m just trying to help
him get started in business.  And from that point on, I didn’t question when
Dee came in and said, I’ve talked to Johnny and this is what we’re gonna do.  I
just assumed that Dee was speaking for Johnny then.

          Elder
stated that this conversation took place in or around 2002, the first time that
he was involved in a transaction between Johnny and Demetrius.

          Elder
testified that he had always been under the impression that Johnny owned 100%
of JPD Guam based on what Johnny had told him but that when the Trinity Hughes
documents reached Guam, Johnny and Kathrina were asked questions about the
profit between Demetrius’s sale to Trinity Hughes and the sale from JPD Guam to
Demetrius.  The big issue for Kathrina and Johnny was whether it looked like
Johnny was getting a kickback from Demetrius, not whether the documents had
ever been sent.  Elder stated,

          And, in
fact, I prepared an affidavit on one closing for the BCI closing for Dee to
sign and send back to JPD Guam to explain to my knowledge there was not one. 
And Dee’s affidavit said that there was not one and explained the reason why
there was a $65,000 fee on the BCI closing.[[19]]
And that seemed to satisfy that—on that closing.

 

          But then
the question arose at tax time back in April or so of ’05 when whoever it was
back in JPD saw this large sale because they looked at the Collateral Transfer
documents and could see that the collateral for the $169,000 note was a
$580,000 note which would clearly indicate it sold for a whole lot more. . . . 


 

But Johnny knew that
in October.  He knew that.  We went over that in detail because I had to
explain to him why he wasn’t getting a Deed of Trust on the property, he was
getting a note secured by Collateral Transfer.[[20]]

. . .  My belief is
[Johnny] had no idea until October 20th until we went into that closing because
he acted at that point like he didn’t know it was selling for so much.  And I
could tell he didn’t like it at that time, but he went ahead and closed on it
because he said that’s what he had agreed to on this.  But—but he knew on
October 20th.  Now prior to that, I don’t know [sic] think he knew is my
opinion.

 

          Elder
testified that his usual practice in conducting real estate closings was to use
the earnest money contract as a roadmap to the closing.  However, according to
Elder, 

from the very
beginning Dee would come in and say, this is what I’m gonna do, send a deed to
Johnny, he’ll sign it and send it back to you.  I’ve already talked to him
about it.  Well, we did this for probably two years.  And I don’t know how many
transactions took place in that regard but that was the normal transaction with
them.

 

Elder
stated, in both his letter and at trial, that he thought the parties’
memorandum of understanding (MOU) fairly resolved the differences between the
parties but that he was not sure whether it had been fully agreed to in any
particular form.  The trial court admitted the MOU as Plaintiff’s Exhibit 12
for the limited purpose of construing the document, but it admitted the MOU as
Defendant’s Exhibit 9 without any limitation.  

          The
MOU memorializes that on July 23, 2004, Demetrius purchased the Trinity Hughes
property from JPD Guam for $211,575, with JPD Guam financing $169,260; that
Demetrius transferred the property to Short Skirts, which then sold the
property to Trinity Hughes for $588,000 and assigned to JPD Guam the note and
lien as collateral for the $169,260 loan; and that the parties agreed to renegotiate
to establish a different value for their interests in the Trinity Hughes
property and note.  The MOU then contains the following terms of the
renegotiation: 

1.    REYES agrees to
endorse the TRINITY Note outright [(]and not as collateral) to JPD, save and
except a twenty per[cent] interest therein, which shall be retained by REYES. 
In exchange for such interest, the Reyes Note to JPD shall be forgiven.

 

2.    In the event TRINITY
pays such Note and does not default under the terms of the Note and Deed of Trust,
REYES shall receive Twenty Six and Three tenths Per Cent (26.3%) of each Note
payment (principal and accrued interest) made and JPD shall receive the
remainder of each note payment made, being Seventy-three and Seven Tenths Per
Cent (80%) thereof.

 

3.    In the event TRINITY
defaults, a foreclosure becomes necessary and JPD acquires title at
foreclosure, it is agreed and understood that:

 

A.   The title to the
property shall be reconveyed to REYES, subject to a Real Estate Lien Note
payable to JPD in the amount of $169,200.00 amortized at 8.5% over 15 years,
secured by a Deed of Trust containing a provision that REYES shall be
prohibited from using the property as collateral for any indebtedness other
than the debt owed to JPD.  In addition to the debt, Reyes shall be liable to
JPD for a prepayment penalty of 15% of the selling price from REYES to any
other party, if the property is sold by Reyes within 5 years from the date of
the note.

 

B.   REYES shall not
receive the return of his down payment of $41,534.93.

 

C.   REYES may pursue
TRINITY for any damages incurred by REYES as a result of its default, one-half
(1/2) of which shall be paid to JPD upon request.

          Demetrius
testified that there was agreement on some parts of the MOU, that he signed it
on April 22, 2005, and that the MOU was the result of “constant pressure from
Kathrina and [his] uncle.”  Demetrius testified that, under the April MOU, he
would be released from the “160 something thousand” that he owed JPD Guam, that
he would not be entitled to his 20% earnest money, and that the MOU would be a
settlement of all claims.

          After
Demetrius signed the MOU on April 22, 2005, JPD Guam proposed other versions of
the MOU.  Demetrius testified that he did not agree to the May 6, 2005 MOU
(Defendant’s Exhibit 10) in which Kathrina had tried to change his indebtedness
from $169,200 to $191,575.  Kathrina testified that Demetrius orally agreed to
the change, which she made on May 5, 2005.

          Johnny
acknowledged that he told Elder that his investors were unhappy when they
learned of the terms of the $588,000 transaction.  However, he also testified
that JPD Guam’s shareholders were himself, Kathrina, his son, and one of his
other nephews.  Johnny stated that there had been other investors in JPD Guam
in the past but not from 2000 to 2009, then corrected himself, stating that
Teker, JPD Guam’s secretary, had one share.  Johnny also testified that the
distribution of shares as reflected in the 2002, 2003, and 2004 minutes was
correct.  The investors he referred to as being unhappy were “[t]he whole
family.”

          Demetrius
testified that prior to March 2005, no one from JPD Guam complained about his
purchase price from JPD Guam for the Trinity Hughes property.  With regard to
all three sales from JPD Guam to Demetrius, Demetrius testified:

Q.  JPD received
55,000 on the first sale; is that correct?

 

A.  Yes.

 

Q.  50,000 on the
second sale?

 

A.  Yes.

 

Q.  And 211,000 on
the third sale?

 

A.  Yes.

 

Q.  For a total of
311,000?

 

A.  Yes.

 

Q.  Which is almost
140,000 more than what they agreed to sell it to you earlier?

 

A.  Yes.

 

Q.  And that sale
would also include the land that went to BCI?

 

A.  Yes.

 

Q.  So in regard to
these transactions that closed in 2002, 2003, 2004, JPD came out with more
money than they would have had you bought the land back in 2002?

 

A.  Yes.

 

Johnny
acknowledged that Demetrius was the grantee on all of the deeds he issued, but
he claimed that he did not intend to sell any of the property to Demetrius.  Johnny
admitted that he did not have any documents to show that JPD Guam did not
intend to sell the three properties to Demetrius.[21] 

D. 
Analysis

          JPD
Guam argues that the great weight of the documentary and testimonial evidence
establishes that the parties entered into a consensual agreement under which
Demetrius would act on JPD Guam’s behalf in locating buyers for JPD Guam’s
properties and in making arrangements for the sale of these properties to such
buyers under JPD Guam’s direction and control.  In support of its argument, JPD
Guam points us to four items of evidence:

·       
The
$25,000 promissory note from Demetrius to Johnny made in their SKB property
transaction, which states that the note will be forgiven if the Trinity Hughes
property sells for over $200,000;

 

·       
Demetrius’s
testimony that he called Johnny to tell him that he had located “a possible
buyer” for the Trinity Hughes property; 

 

·       
Norseworthy’s
and Elder’s testimonies with regard to Demetrius “speaking for” Johnny; and 

 

·       
The
MOU provisions that entitle Demetrius “only to an interest and commission
payment equal to approximately 26% of the entire value paid by Trinity Hughes”
and that limit Demetrius’s ability to recover in the event Trinity Hughes
defaults.

 

          Demetrius
responds that all of the documentary evidence supports his position, that the
three transactions were just a continuation of prior purchase agreements
between Demetrius and Johnny, and that the testimonial evidence boils down to a
“swearing match” between the parties.

          We
first note that “[t]he critical element of an agency relationship is the right
to control, and the principal must have control of both the means and details
of the process by which the agent is to accomplish his task in order for an
agency relationship to exist.”  McAfee, Inc. v. Agilysys, Inc., 316
S.W.3d 820, 829 (Tex. App.—Dallas 2010, no pet.) (stating that the “mere fact
that one party to a relationship subjectively trusts the other does not
indicate the existence of a fiduciary relationship”).  The documentary evidence
and testimony, as set out in extensive detail above, supports the trial court’s
findings that Demetrius was not JPD Guam’s or Johnny’s agent and that a
fiduciary relationship did not exist between them:  Nothing in the record
demonstrates that JPD Guam controlled the prices that Demetrius charged BISD,
SKB, or Trinity Hughes for the land Demetrius sold to those entities or that
JPD Guam told Demetrius how to sell the land to those entities.  See Seaway
Prods. Pipeline Co. v. Hanley, 153 S.W.3d 643, 651 n.10 (Tex. App.—Fort
Worth 2004, no pet.) (describing the “right to control test,” under which a
court examines whether the alleged principal had the right to determine the
details of the agent’s work in determining whether an individual is an agent or
actually an independent contractor).  Rather, Demetrius initially placed all of
the land under contract with Johnny and then began marketing it, paying to have
it appraised prior to the expiration date of the first earnest money contract
with JPD Guam.  Johnny did not tell Demetrius to have the land appraised;
rather, Johnny testified that he did not know anything about the appraisal.

          Further,
the documentary evidence reflects that JPD Guam sold all three properties at
issue directly to Demetrius, who then sold the properties to the third parties
at a profit, and both Lilley—who participated in two of the transactions—and
Taylor testified that they believed they were dealing only with Demetrius.  Cf.
Fryer, 227 S.W.3d at 353 (describing apparent authority as acts of
participation, knowledge, or acquiescence by the principal that clothe the
agent with the indicia of authority in the agent’s transactions with third
parties).

          And
although the debt forgiveness language in the promissory note requires the
Trinity Hughes property to sell for more than $200,000, all this reference
clearly shows is that Johnny wanted at least $200,000 for that land (and for
which price he subsequently contracted with Demetrius—first for $207,575 and
later for $211,575 when closing was delayed).  The note’s language is not
inconsistent with Demetrius’s theory at trial that the
considerably-more-experienced Johnny wanted to help Demetrius get started in
business.  Demetrius testified that he and Johnny included the language in the
note in their negotiations, that when he found a possible buyer for the Trinity
Hughes property, he called Johnny and told him, and that they agreed on a cash
purchase of $207,000 by Demetrius from JPD Guam.

          Additionally,
Norseworthy’s testimony—as set out above—was ambiguous, showing that he really
had little idea if Demetrius had ever represented Johnny, particularly when he
stated that he thought Demetrius had represented Johnny when RUCR owned the
property.  In contrast, the documentary evidence showed that Demetrius tried
repeatedly to acquire all of the property at issue, first from RUCR (as opposed
to representing RUCR) and then from Johnny and JPD Guam.  And with regard to
Elder’s “speaking for” testimony—which is set out in its entirety above—this
testimony was also ambiguous in that immediately before this statement, Elder
said that he told Johnny that Demetrius was flipping the properties and that
Johnny told him that he was trying to help Demetrius get started in business.  Demetrius
testified that he was not acting as Johnny’s or JPD Guam’s agent, and Johnny
testified that Demetrius was; the trial court was the sole judge of their
credibility and the weight to be given their testimonies.  See Golden
Eagle Archery, 116 S.W.3d at 761.

          Finally,
while the MOU provisions—had they been accepted by both parties—would have
limited Demetrius’s profit, they also set out a recitation of the facts that is
consistent with Demetrius’s theory:  Demetrius purchased the Trinity Hughes
property from JPD Guam for $211,575 with JPD Guam financing $169,260, and
Demetrius transferred the property to Short Skirts, which then sold the
property to Trinity Hughes for $588,000 and assigned to JPD Guam the $580,000
note and lien as collateral for the $169,260 loan.  The MOU contains nothing
about Demetrius acting as Johnny’s or JPD Guam’s agent in this transaction. 
Having reviewed the entire record, we conclude that Johnny and JPD Guam have
failed to show that the trial court’s no-agency finding is against the great
weight and preponderance of the evidence.  And the credible evidence supporting
the finding is not so weak, or so contrary to the overwhelming weight of all
the evidence that the finding should be set aside and a new trial ordered.  See
Gonzalez, 195 S.W.3d at 681–82; Cropper, 754 S.W.2d at 651; Pool,
715 S.W.2d at 635.  We overrule Johnny and JPD Guam’s sole issue. 

IV. 
Conclusion

          Having
overruled Johnny and JPD Guam’s sole issue, we affirm the trial court’s
judgment.

 

                                                                             BOB
MCCOY

                                                                             JUSTICE

 

PANEL:  LIVINGSTON, C.J.; MCCOY and GABRIEL,
JJ.

 

DELIVERED:  July 21, 2011









[1]See Tex. R. App. P. 47.4.





[2]At the time of the trial,
JPD Guam owned only one condominium.





[3]Johnny did not sign this
sales contract, but he initialed the bottom of each page.  The sales price
included a note for $87,500 payable to Johnny in three annual installments.





[4]Johnny testified that he
asked JPD Guam’s board—which he said was, at the time, him, his partner, and a
Japanese firm—for permission to buy the land and that the property’s asking
price was $300,000, but he paid only $195,000.





[5]All of the land at issue
here is out of the A.R. Collins Survey, Abstract No. 414, Wichita County.





[6]Taylor testified that
BISD’s board of trustees rejected the initial offer because BISD could not buy
all twelve acres.





[7]The minutes reflect that Johnny
held 199,998 shares, Kathrina held 1,000 shares, and Daniel held 1 share.





[8]The September 20, 2003
minutes from JPD Guam’s shareholders’ annual meeting, admitted as Defendant’s
Exhibit 25, noted, “The sale of the 6 acres in Wichita Falls, Texas to John
Tower School has not materialized yet.  No word from Dee Reyes.”  The
“Shareholders Present” section is the same as the 2002 minutes, showing Johnny,
as president, Kathrina, as secretary, and Daniel Reyes by proxy, with the same
share distribution.





[9]The enclosures were not
included in the trial exhibit.





[10]The September 21,
2004 minutes from JPD Guam’s shareholders’ annual meeting were admitted in
evidence and reflect that

 

The commercial lot of
approximately 11 acres in Wichita Falls, Texas sold for $75,000[,] of which
$50,000 was received in December 2003, the balance of $25,000 was loaned to Dee
Reyes.  Dee said he needed to borrow the money and will pay it back in six
months.  To date, Dee Reyes has not paid back the money per agreement.  Johnny
Reyes to follow-up on status of payment.

 

They also show that Johnny was
still president, Kathrina was still secretary, Daniel Reyes was still present
by proxy, and the share distribution remained the same as 2002 and 2003.





[11]Probst testified that he
surveyed both parcels of land for the BCI sales.  Demetrius’s property
contained 32.198 acres (31.779 net), and JPD Guam’s property contained 7.010
acres (6.541 net).





[12]Trinity Hughes’s October
20, 2004 certificate of resolution shows that it resolved to purchase 11.752
acres and 5.77 acres for $588,000.





[13]Elder stated that it was
extremely unusual to file a warranty deed before closing and that it probably
should not have been done in this transaction “except for what had gone on in
the past with Dee coming in and telling us what he and Johnny had talked about
and done and do this.”





[14]The minutes of the
JPD Guam board of directors meeting show authorization to sell 6.541 acres of
real property to BCI for $115,000, signed by Johnny on October 20, 2004.





[15]The exhibits show that
JPD Guam financed $169,260 of its sale of the Trinity Hughes property to
Demetrius and received a “note secured by collateral transfer of note and lien”
for $169,260.





[16]Norma Toliver, the chief
deputy in the Wichita County Clerk’s Office, testified that her records showed
that a transfer of deed of trust was recorded on October 26, 2004, from
Demetrius A. Reyes to JPD Guam Co., Inc., and returned to Johnny Reyes in
Tamuning, Guam.  Her records showed that the document was mailed from the
clerk’s office to Guam on November 8, 2004, and she stated that there were no
notations in her system to show that the postal service returned it to the
clerk’s office.  Kathrina testified that the clerk mailed the document to suite
102 but that the correct address was suite 101.  Suite 102 is down the hall
from suite 101.





[17]In April 2005, Lilley
sent a letter to Elder referring to Demetrius as Elder’s client and stating,
“[W]e continue to honor the commitment we made to your client to vigorously
work to sell and/or develop 18 Acre [sic] to each of our benefit.”





[18]Elder explained that what
he called “flipping” was Demetrius buying property, waiting for it to close,
and using the money he sold it for to close the first transaction, and he said
that he would not participate in flipping-type transactions unless everyone
knew what was going on, which is why he told Johnny that Demetrius was flipping
the properties “and selling them for considerably more than what he [was]
buying them from [Johnny] for.”





[19]Elder referred to a
$65,000 “commission” that Demetrius received, but he noted that Demetrius was
not a licensed real estate agent at the time of this sale.  The BCI-JPD Guam
settlement statement reflects that the sale price to JPD Guam was $115,000 but
with a $65,000 “Total Reduction Amount Due to Seller.”  Demetrius testified
that because of BCI’s environmental concerns, he had to clean up the property,
including getting a backhoe to dig ditches to prove there was not a trash dump
underneath, and that he had to have the property surveyed.  The record does not
reflect what Demetrius had to pay for these activities.





[20]Elder elaborated,
stating,

Well, Johnny—Johnny seemed to want to make sure he had
a lien on the property.  He kept asking—if he asked that once, I bet he asked
it three times.  I’m gonna have a lien on this property.  And I’d have to go
back and say every time, no, Johnny, you’re gonna have a round-about lien, but
you’re not gonna have a lien on the property itself.  What you’re gonna have a
lien on is a note.  Now, that note is secured by a lien on the property.

And I went through this and I could tell that he really
wasn’t understanding because I had to explain it to him more than once.  And
I’m not sure—to be quite honest with you, I’m not sure he really ever
understood what I was trying to tell him.  But there’s a big difference between
taking a lien on real estate and taking a lien on a note secured by real
estate.  But that was how that transaction changed from June to October.

Elder explained that what
Johnny did not understand was the distinction between a lien on real estate and
a lien on a note secured by real estate but that Johnny finally understood that
he was getting collateral for his note and that it was in some way related to
that land.





[21]Demetrius is not the only
family member who Johnny has sued in a land dispute.  Johnny sued his daughter
Velma for “cheating” him.  He issued a warranty deed to Velma in her name and
told her not to file it until he died.  She ignored his instructions and filed
the deed, and he disowned her.